■ MICHAEL FISHER et al., Appellants, v ANGEL DiPIETRO, Respondent. [864 NYS2d 532]—

In an action to recover damages for personal injuries, etc., the plaintiffs appeal, as limited by their brief, from so much of an order of the Supreme Court, Kings County (Knipel, J.), dated July 16, 2007, as granted that branch of the defendant's motion which was to dismiss the complaint pursuant to CPLR 3211 (a) (7).

Ordered that the order is affirmed insofar as appealed from, with costs.

On October 11, 2003 Mark Fisher, a student at Fairfield University, was in a Manhattan bar when he encountered Angel DiPietro, whom he knew from school. Fisher, DiPietro, and a number of DiPietro's friends later went to Brooklyn, where Fisher was shot and killed in a robbery. Two individuals were subsequently tried and convicted for the murder. Thereafter, Fisher's father, as administrator of his estate, and both of Fisher's parents, individually, commenced this negligence action against DiPietro, claiming that she breached a duty she

undertook to exercise reasonable care in securing Fisher's safety. In pertinent part, the complaint alleged the following facts: "On October 11, 2003, [Fisher] and friends from Fairfield University went to a Manhattan bar . . . where they met another friend from Fairfield, Angel DiPietro, and some of her friends. . . . Later in the night Fisher and Denihan [a friend of DiPietro] left [the bar] to meet DiPietro at another bar . . . When Fisher and Denihan arrived . . . , DiPietro was waiting outside for them with two other males, her good friend Albert Cleary . . . and Cleary's lifelong friend John Giuca . . . Both . . . Cleary and Giuca . . . had a clear history of violence . . . Cleary was on probation for [assault] . . . Giuca was a notorious neighborhood gang member [who, as a teenager, was a member of the Crips and who later became a capo in the gang known as the Ghetto Mafia.] . . . On or about a week prior to Giuca's involvement with the Fisher murder, Giuca told Cleary the prerequisite to becoming a Ghetto Mafia member was to murder someone . . . [I]t was clear to the group that Fisher, now separated from his friends, had drank [*sic*] too much alcohol, and was disoriented to his surroundings . . . DiPietro offered to assist Fisher find a way home or a place to stay the night. [She] provided [him] with her mobile phone to contact his friends, however, Fisher's attempts were unsuccessful. Subsequently, DiPietro decided to take Fisher with her and her friends to Giuca's home in Brooklyn. DiPietro, Giuca, Denihan, and Cleary flagged down a taxi cab, loaded Fisher in the vehicle, and had the vehicle drive the five of them to Giuca's home in Brooklyn . . . Shortly after the group . . . arrived at Guica's home, several of [his] Ghetto Mafia associates also arrived . . . Subsequently . . . some of the individuals . . . conspired to escort the then intoxicated and disoriented Fisher to an automated teller machine ('ATM') . . . [a]t which point he . . . would be forced by gunpoint to withdraw the maximum amount allotted from his account . . . As the evening progressed, DiPietro decided to spend the remainder of the night with Cleary at his mother's home down the street, leaving her intoxicated and disoriented friend, Fisher, behind with Giuca and his Ghetto Mafia associates . . . Eventually . . . Fisher was taken to an ATM by some of the individuals, [who shot him after he] withdrew only twenty dollars."

DiPietro filed a pre-answer motion, inter alia, to dismiss the complaint pursuant to CPLR 3211 (a) (7). The Supreme Court granted that branch of the motion which was to dismiss the complaint pursuant to CPLR 3211 (a) (7), and we affirm the order insofar as appealed from.

"[A] motion to dismiss made pursuant to CPLR 3211 (a) (7)

will fail if, taking all facts alleged as true and according them every possible inference favorable to the plaintiff, the complaint states in some recognizable form any cause of action known to our law" (*Shaya B. Pac., LLC v Wilson, Elser, Moskowitz, Edelman & Dicker, LLP*, 38 AD3d 34, 38 [2006]; *see AG Capital Funding Partners, L.P. v State St. Bank & Trust Co.*, 5 NY3d 582, 590-591 [2005]; *Leon v Martinez*, 84 NY2d 83, 87-88 [1994]; *Sheroff v Dreyfus Corp.*, 50 AD3d 877 [2008]). Here, the plaintiffs' claim is predicated on the so-called "Good Samaritan" rule which, as enunciated in the Restatement (Second) of Torts § 324, provides that "[o]ne who, being under no duty to do so, takes charge of another who is helpless adequately to aid or protect himself is subject to liability to the other for any bodily harm caused to him by (a) the failure of the actor to exercise reasonable care to secure the safety of the other while within the actor's charge, or (b) the actor's discontinuing his aid or protection, if by so doing he leaves the other in a worse position than when the actor took charge of him." Thus, the issue here is whether, taking as true all the facts alleged in the complaint, and according them every possible inference favorable to the plaintiffs, the complaint states facts which, if true, establish that DiPietro took charge of Fisher at a time when he was "helpless adequately to aid or protect himself" and proximately caused his injury and death either by failing to exercise reasonable care to secure his safety while he was within her charge, or by discontinuing her aid or protection when doing so left him in a worse position than when she took charge of him.

Even assuming that the allegations in the complaint would, if proven, establish that Fisher was "helpless adequately to aid or protect himself," there is nothing in the complaint to suggest that DiPietro, a college student, knew or had reason to believe that Giuca had "a clear history of violence," or was associated with any gang. Indeed, there is no allegation that DiPietro had ever before met Giuca, who is described only as Cleary's lifelong friend. Moreover, there is nothing in the complaint from which it may be inferred that DiPietro had any knowledge that individuals at the house were conspiring "to escort the then intoxicated and disoriented Fisher to an . . . 'ATM' . . . [a]t which point he . . . would be forced by gunpoint to withdraw the maximum amount allotted from his account." Nor are any facts alleged to suggest that, when she decided to go to Cleary's house, DiPietro was knowingly leaving Fisher in a worse position than he had earlier been.

In sum, according to the complaint, DiPietro merely took Fisher along to the same house to which she and her friends

were going. Once there, no violence was committed against them, and there is nothing to suggest that DiPietro knew or should have known either that violence was planned against Fisher after she left the house, or that her remaining there would have secured his safety. The complaint contains no allegations from which it may be inferred that, from DiPietro's perspective, the events that ultimately resulted in the loss of Fisher's life were reasonably foreseeable. Accordingly, the Supreme Court properly granted that branch of DiPietro's motion which was to dismiss the complaint pursuant to CPLR 3211 (a) (7).

The plaintiffs' remaining contentions are without merit. Fisher, J.P., Santucci, Angiolillo and McCarthy, JJ., concur. [*See* 16 Misc 3d 1111(A), 2007 NY Slip Op 51385(U).]